IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2010

## STATE OF TENNESSEE v. BRANDON TAYLOR FISHER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-B-1811     Steve Dozier, Judge**

_____

**No. M2008-01839-CCA-R3-CD - Filed August 18, 2010**

_____

The defendant, Brandon Taylor Fisher, stands convicted of robbery and kidnapping, both Class C felonies. The trial court sentenced him as a Range I standard offender to five years for robbery and four years for kidnapping and ordered him to serve the sentences consecutively in the Tennessee Department of Correction. On appeal, the defendant challenges the trial court's imposition of consecutive sentences. Following our review, we conclude that the trial court failed to make findings sufficient to justify consecutive sentences under Tennessee Code Annotated section 40-35-115(b) and remand for a new sentencing hearing solely on the issue of whether consecutive sentences are appropriate in this case.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part; Case Remanded**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. THOMAS T. WOODALL, J., not participating.

William Thomas Mullican, Brentwood (on appeal), and Reginald Horton (at trial) Nashville, Tennessee, for the appellant, Brandon Taylor Fisher.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

**Background**

On June 22, 2007, a Davidson County grand jury indicted the defendant for aggravated robbery, a Class B felony, and especially aggravated kidnapping, a Class A felony. The parties presented the following evidence at the defendant's May 2008 jury trial.

Xavier Willis testified that on January 6, 2007, he was working at his studio on Dickerson Pike when his friend, Shawn Nettles, called him. Mr. Nettles told him that someone named Green would be coming to the studio to give Mr. Willis $100 that Green owed Mr. Nettles and to pick up a car battery that Mr. Nettles had left on the studio property. When Mr. Willis got off the phone with Mr. Nettles, he noticed a gray car with tinted windows pull into the studio parking lot to make a u-turn with two people in the front seat. He turned away from the car to put his dogs up and heard the doors of the car opening and closing. When he looked back at the car, the passenger had moved to the back seat. The defendant, whom Mr. Willis knew from his neighborhood, was in the driver's seat and asked Mr. Willis to sit in the car to talk. Mr. Willis sat in the front passenger's seat and closed the door. He then felt a gun pressed to the back of his head. Mr. Willis testified that the defendant told his accomplice to shoot him if he moved. The defendant removed Mr. Willis's pants and shoes and searched through his pockets, finding his keys and cell phone. The defendant asked where Mr. Willis's money was. When Mr. Willis responded that he did not have any money with him, the defendant searched Mr. Willis's 2005 white Impala. He opened the trunk and removed a case containing $1,800 and a radio device. When the defendant returned to the car, he told his accomplice that they would have to kill Mr. Willis because he knew them. The defendant began driving away, and Mr. Willis jumped out of the car after the defendant turned on to Dickerson Pike. He returned to his studio, wearing only a shirt and his underwear, and called the police. The police took his statement and processed the crime scene. At a later point, Detective Bradley showed Mr. Willis a photo lineup, and he identified the defendant as the driver of the gray car and the man who took the items from his car. Mr. Willis was unable to identify the person in the back seat of the car.

Detective David Zoccola, of the Metropolitan Nashville Police Department, testified that he was on patrol on January 6, 2007, when dispatch sent him to 1411 Dickerson Pike to take a report. He met Mr. Willis at that location, and Mr. Willis reported that a gray Ford Crown Victoria had pulled into his driveway. When he approached the car, someone pulled a gun on him and forced him into the car. At some point, the driver of the car told the other suspect to shoot Mr. Willis because he did not have any money. They made him remove his pants and shoes, and the driver used his keys to open his car. The driver took approximately $1,300 that was in a case in the trunk of the car and returned to the Crown Victoria. With Mr. Willis still inside, the driver began driving away. Mr. Willis "bailed out of the car" and returned to his business to call the police. Mr. Willis reported that the men took the cash, a cell phone, his pants, shoes, and wallet. Detective Zoccola notified the identification section so they could process the scene. He completed the offense report and returned to patrol.

Later that day, dispatch sent him back to 1411 Dickerson Pike because Mr. Willis had additional information. Mr. Willis reported that, after talking to friends, including Mr. Nettles, he had come up with the defendant's name as a suspect because Mr. Nettles had spoken with the defendant earlier and had seen him in his car.

Alicia Primm, a crime scene investigator with the Metropolitan Nashville Police Department, testified that she photographed the scene at 1411 Dickerson Pike and processed the trunk of Mr. Willis's car for fingerprints. She lifted one fingerprint from the lid of the trunk and two from the bumper of the car.

Linda Wilson, a fingerprint analyst with the Metropolitan Nashville Police Department, testified that she received the latent print cards for this case on January 8, 2007. She searched the Automated Fingerprint Identification System ("AFIS") for a matching print, but she did not get an immediate result. She explained that AFIS generates lists of possible candidates for matches each day. When she received the list of possible candidates for this case, she retrieved a ten-print card for a possible match from a known fingerprint file. Ms. Wilson compared the known prints with the latent print and concluded that the "print from the trunk was one in the same as [the defendant's] left middle finger." Regarding the other two prints lifted from the victim's car, Ms. Wilson testified that one print "was of no value for comparison" and the other print did not return a result from AFIS.

Detective Terrence Bradley, of the Metropolitan Nashville Police Department, testified that he compiled a photo lineup, which included the defendant, to show to Mr. Willis. Mr. Willis identified the defendant.

On cross-examination, Detective Bradley testified that he prepared two lineups, but Mr. Willis did not make an identification for the second one.

Melvin Shawn Nettles testified that he worked at Mr. Willis's studio in January 2007. He further testified that he knew the defendant and that he spoke with both Mr. Willis and the defendant on January 6, 2007. Mr. Nettles said that the defendant was supposed to bring him money for a dog and a car battery, and the defendant also had business with Mr. Willis. Mr. Nettles instructed the defendant to leave the money at Mr. Willis's studio if he was not there. After he and the defendant spoke by phone, Mr. Nettles saw the defendant driving down Fern Avenue toward Dickerson Pike at approximately 3:30 p.m.. He called Mr. Willis to let him know that the defendant would be coming by the studio. An hour later, Mr. Nettles went to the studio, and the police were there.

On cross-examination, Mr. Nettles testified that he did not know what business the defendant had with Mr. Willis, but he was "pretty sure" that they knew each other. He

agreed that he wrote a letter to the District Attorney General explaining that he did not set up the robbery, that Mr. Willis's cousin had threatened him under the assumption that he set up the robbery, and that Mr. Willis had said that he had purchased bad drugs and wanted his money back.

Detective Curtis Hafley, of the Metropolitan Nashville Police Department, testified that he was a patrol officer on February 4, 2007, and came in contact with the defendant on that day. Prior to February 4, 2007, Detective Hafley and other officers attempted to serve a warrant on the defendant at his home, but the defendant was not there. The defendant's family told them that the defendant was driving a silver Crown Victoria with a temporary tag in the back window. On February 4, 2007, Detective Hafley observed a Crown Victoria matching the description that the defendant's family gave him in the area of Dickerson Pike and Douglas Avenue. He activated his lights, and the car stopped near Fern Avenue. When Detective Hafley approached the car on foot, the driver "took off at [a] high rate of speed." He returned to his vehicle and pursued the Crown Victoria. He said that he lost sight of the car for a moment, but by-standers directed him to make a right turn. After making the turn, he observed the Crown Victoria stopped in the middle of the street and people running from it. Detective Hafley pursued the defendant and found him sitting on a hill nearby. He then placed the defendant in custody.

The defendant testified that he had a felony possession of cocaine conviction from April 1999. He said that he had known Mr. Willis since the sixth grade because they grew up in the same neighborhood. Additionally, he knew Mr. Willis because they bought and sold drugs from each other. On January 6, 2007, Mr. Willis contacted him to buy drugs. He did not have the amount that Mr. Willis requested, but because he wanted the money, he decided to sell Mr. Willis half real drugs and half fake drugs. According to the defendant, there was never any discussion about money for a dog or a car battery. The defendant said that he went to Mr. Willis's studio, and Mr. Willis got into his car. At Mr. Willis's direction, the defendant went to the trunk of Mr. Willis's car and removed the cash for the drugs. The defendant testified that he took $1,000 to $1,300. After the exchange, the defendant left the studio. Later, Mr. Willis called him to complain about the fake drugs, but the defendant refused to return the money to him. The defendant said that Mr. Willis threatened him. A week to two weeks later, Mr. Willis called him and said that he had "put the police on [him]." The defendant did not know that there was a warrant outstanding for his arrest when Detective Hafley took him into custody in February 2007. The defendant denied robbing and kidnapping Mr. Willis.

On cross-examination, the defendant testified that he had sold drugs since he was sixteen years old, and at the time of trial, he was twenty-seven years old. The defendant said

-4-

that it was unusual for someone to call the police if they received fake drugs. He explained that he ran from police on February 4, 2007, because he had been smoking marijuana.

The state called Detective Darryl Morton, of the Metropolitan Nashville Police Department, as a rebuttal witness. Detective Morton testified that based on his experience with drug transactions, an ounce of cocaine would cost $900 to $1,000. He said that in January 2007, more cocaine was available in the Nashville area, so prices would have been less at that time.

The state recalled Xavier Willis. He testified that the cash from his trunk was part of his girlfriend's advance income tax return. She had refreshed his memory that the amount of cash that she gave to him was $1,300.

The jury found the defendant guilty of robbery and kidnapping, both Class C felonies. The trial court held a sentencing hearing on June 26, 2008. The state presented the defendant's presentence report, which the court admitted as evidence. Both the defendant and his wife testified.

Veronica L. Fisher, the defendant's wife, testified that they had been married for over three years. She said that if the court granted probation, the defendant would return home to live with her, and she was able to support him until he found employment. Mrs. Fisher said that she and the defendant did not have children together, but the defendant had three children with whom he had a good relationship. She testified that she did not know the defendant to be a violent person.

On cross-examination, Mrs. Fisher testified that she was aware that the defendant had sold drugs since he was sixteen years old.

The defendant testified that he was pursuing his GED and was "get[ting] ready to live a productive life on the street." He said that the drug conviction from 1999 was his only felony. He testified that he did not carry a weapon and did not have convictions for weapons charges or violent crimes. The defendant said that he had never been on probation "on the streets" and explained that he served an eight year sentence because he violated the Lifelines program. The defendant admitted that he sold drugs after serving his sentence.

On cross-examination, the defendant denied robbing Mr. Willis.

The court entered a written sentencing order on July 1, 2008. The court denied alternative sentencing based on the violent nature of the offenses, specifically citing the defendant's order to his armed accomplice to shoot the victim, and found that confinement

was necessary to avoid depreciating the seriousness of the offenses. The court found three enhancement factors to be applicable: (1) the defendant had a history of criminal convictions and behavior beyond that necessary to establish the sentencing range; (2) the defendant was the leader in the commission of an offense involving two or more criminal actors; and (3) the defendant was adjudicated as a juvenile to have committed delinquent acts that would constitute felonies if committed by an adult. The court placed minimal weight on the mitigating factor that the defendant suffered from a drug problem. The court found that the defendant was "a danger to this community" based on his conduct during the commission of the offenses and that he "ha[d] not demonstrated an ability to be rehabilitated." Citing *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the court found that an "aggregate sentence [was] necessary to protect the public." The court sentenced the defendant as a Range I standard offender to five years for robbery and four years for kidnapping and ordered him to serve the sentences consecutively in the Tennessee Department of Correction.

## Analysis

On appeal, the defendant argues that the trial court erred by imposing consecutive sentences. Specifically, he contends that he is not a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4). The state concedes that the trial court did not make specific findings as required by *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), but argues that a *de novo* review supports the imposition of consecutive sentences.

A defendant's sentence is reviewed by the appellate courts *de novo* with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). For this presumption to apply to the trial court's actions, there must be an affirmative showing in the record that the trial court considered sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). While determining or reviewing a sentence, the courts must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence offered by the parties on the enhancement and mitigating factors; (6) any statement the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103(5), -210(b); *State v. Ashby*, 823 S.W.2d 166, 168; *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

If the trial court has imposed a lawful sentence by following the statutory sentencing procedure, has given due consideration and proper weight to the factors and sentencing principles, and has made findings of fact adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. *State v. Fletcher*,

805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). However, if the trial court does not comply with statutory sentencing provisions, our review of the sentence is *de novo* with no presumption the trial court's determinations were correct. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000).

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of the following statutory criteria apply:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
>
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) [t]he defendant is sentenced for an offense committed while on probation; or
>
> (7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

If the court concludes the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. *Imfeld*, 70 S.W.3d at 708. First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939. However, such specific factual findings are unnecessary for the other categories of Tennessee Code Annotated section 40-35-115(b). *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

In this case, the trial court did not make an explicit finding regarding any of the factors under Tennessee Code Annotated section 40-35-115(b) that justify the imposition of consecutive sentences. The defendant's lack of potential for rehabilitation and the fact that he is a danger to the community are not valid bases upon which to impose consecutive sentencing. *See* Tenn. Code Ann. § 40-35-115(b)(1)-(7). The court's finding that an "aggregate sentence [was] necessary to protect the public" satisfies one prong of the *Wilkerson* factors for defendants who are dangerous offenders under Tennessee Code Annotated section 40-35-115(b)(4) but by itself is insufficient to justify consecutive sentences. Because the trial court failed to justify its imposition of consecutive sentences under any factor listed in Tennessee Code Annotated section 40-35-115(b), we reverse the judgment of the trial court as to consecutive sentences and remand for a new sentencing hearing to consider whether consecutive sentences are warranted in this case. *See State v. Tavarski Childress*, No. W2004-02545-CCA-R3-CD, 2006 WL 3804418, at *12 (Tenn. Crim. App., at Jackson, Dec. 27, 2006). We affirm the length of the sentences.

## Conclusion

Based on the foregoing reasons, we affirm the defendant's convictions and the length of sentences imposed. However, we remand for a sentencing hearing to determine the sole issue of whether consecutive sentences are appropriate.

_____

J.C. McLIN, JUDGE

-8-